**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CHANO EDGELL,

     Plaintiff,

     vs.                                     Civ. No. 21-269 KK

KILOLO KIJAKAZI, Acting
Commissioner of Social Security
Administration,[1]

     Defendant.

**MEMORANDUM OPINION AND ORDER[2]**

THIS MATTER is before the Court on Plaintiff Chano Edgell's Motion to Reverse and Remand, with Supporting Memorandum (Doc. 22), filed October 2, 2021. The Acting Commissioner of the Social Security Administration ("Commissioner") responded in opposition to the Motion on January 31, 2022, and Mr. Edgell replied in support on February 15, 2022. (Docs. 28, 29.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being otherwise sufficiently advised, the Court finds the Motion is well taken and should be GRANTED.

## I.  Background

This is Mr. Edgell's second appeal seeking review of the Commissioner's decision denying his claims for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") under 42 U.S.C. §§ 401-434 and 1381-1383f of the Social Security Act. (Doc. 1;

---

[1] Kilolo Kijakazi has been automatically substituted for her predecessor, Andrew Saul, as the defendant in this suit. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 13.)

AR 769.[3]) Mr. Edgell suffers from the severe, medically determinable impairments of cervicalgia, migraine headaches, bullet fragment in right lower leg, obesity, attention deficit/hyperactivity disorder ("ADHD"), mild concussive head injury, and conversion disorder. (AR 772.) He completed high school, attended "a couple of semesters" of community college, and most recently worked as a produce stocker, custodian, and unarmed security guard before he claims he became disabled. (AR 37, 39-40, 811-14, 1564.) On August 13, 2013, at 27 years old, Mr. Edgell applied for DIB and SSI, alleging he is disabled because he was shot in the right leg and has attention deficit disorder ("ADD") and post-traumatic stress disorder ("PTSD").[4] (AR 62, 77, 92-93.) His alleged onset date is January 5, 2013, and his date last insured is March 31, 2018. (AR 35, 772.)

Disability Determination Services found Mr. Edgell not disabled initially and on reconsideration. (AR 92-93, 122-23, 769.) Thereafter, Administrative Law Judge ("ALJ") Michelle Lindsay held a hearing on the merits of his applications. (AR 31-61.) On September 29, 2016, the ALJ issued an unfavorable decision. (AR 9-25.) The Appeals Council denied Mr. Edgell's request for review and upheld the ALJ's decision on October 4, 2017.[5] (AR 1-3.)

Mr. Edgell sought review of the ALJ's decision in this Court on December 5, 2017. (AR 836-37.) On July 13, 2018, the Court granted the Commissioner's motion to remand pursuant to sentence four of 42 U.S.C. § 405(g). (AR 846-47.) On November 14, 2018, the Appeals Council vacated the ALJ's decision and remanded the matter "for further consideration of [Mr. Edgell's residual functional capacity], in particular his need for a cane, walker or wheelchair." (AR 902-

---

[3] Citations to "AR" are to the Certified Transcript of the Administrative Record filed in this matter on August 2, 2021. (Doc. 19.)

[4] Mr. Edgell turned 28 shortly before completing his initial application on November 15, 2013. (AR 62, 77, 200.)

[5] The Appeals Council directed its notice denying Mr. Edgell's request for review to "Chino Engel." (AR 1.) However, the listed address was Mr. Edgell's and he has not contested that the notice is properly part of the record in this case. (AR 1, 38; Docs. 22, 29.)

04.) Meanwhile, Mr. Edgell had submitted subsequent applications for DIB and SSI in December 2017, which the ALJ consolidated with his August 2013 applications for purposes of her review on remand. (AR 769, 808-09, 838-39.) The ALJ held another hearing on October 24, 2019, at which Mr. Edgell and a vocational expert testified. (AR 804-25.) On February 4, 2020, ALJ Lindsay issued a second unfavorable decision. (AR 766-93.)

Applying the Commissioner's five-step sequential evaluation process to determine whether Mr. Edgell is disabled,[6] the ALJ found at step one that Mr. Edgell has not engaged in substantial gainful activity since his alleged onset date. (AR 772.) At step two she found that, in addition to the severe impairments listed earlier in this section, he also suffers from the non-severe impairments of gastroparesis, gastroesophageal reflux disease, one-episode atrial flutter, and transient bilateral vision loss. (AR 772.) At step three, the ALJ determined that Mr. Edgell's impairments do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 774.)

At step four,[7] the ALJ found that Mr. Edgell has the residual functional capacity ("RFC")

---

[6] The five-step sequential evaluation process requires the ALJ to determine whether:

(1)    the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)    the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)    any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)    the claimant can return to his past relevant work; and, if not,
(5)    the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[7] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider

3

to perform light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) with the following limitations: The claimant is able to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit for at least six hours in an eight-hour workday, and stand and walk for six hours in an eight-hour workday. He can never climb ladders, ropes, or scaffolds. He must completely avoid unprotected heights. He is able to understand, remember, and carry out simple instructions, and is able to maintain attention and concentration to perform and persist at simple tasks for two hours at a time without requiring redirection to task. He can have occasional contact with the general public and superficial interactions with co-workers and supervisors. He requires work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning.

(AR 777-78.)

Also at step four, the ALJ found that Mr. Edgell is unable to perform any of his past relevant work. (AR 790-91.) Thus, the ALJ proceeded to step five, at which she found "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (AR 791.) The ALJ relied on the VE's testimony that an individual with Mr. Edgell's age, education, work experience, and assigned RFC could perform jobs including Marker, Silver Wrapper, and Routing Clerk. (AR 791-92.) Therefore, the ALJ concluded that Mr. Edgell "has not been under a disability, as defined in the Social Security Act, from January 5, 2013, through the date of this decision[.]" (AR 792.)

The Appeals Council affirmed the ALJ's February 4, 2020 decision on January 29, 2021,[8] (AR 759-62), making that decision the Commissioner's final decision from which Mr. Edgell now

---

all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

[8] In its January 2021 notice, the Appeals Council incorrectly identified the date of the ALJ's decision as January 30, 2020. (AR 759.) However, the notice refers to Mr. Edgell by name and is addressed to his former counsel, and he has not contested that it is properly part of the record in this case. (AR 759; Docs. 22, 29.)

appeals. The Court provides further background as it becomes relevant to the issues discussed below.

## II. <u>Standard of Review</u>

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted).

Thus, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III. <u>Analysis</u>

Mr. Edgell argues that, in assessing his RFC at step four, the ALJ erroneously failed to account for functional limitations arising from the severe mental impairments she found at step two. (Doc. 22 at 5-10.) He also argues that the ALJ weighed his reported symptoms improperly by discounting physical symptoms with a psychological but not physiological source. (*Id.* at 6, 10-14.)

In response, the Commissioner argues the ALJ was not required to "[l]ine [u]p" her findings at steps two and three with her RFC assessment at step four, and that substantial evidence supports the assigned RFC. (Doc. 28 at 8-11.) The Commissioner also argues that the ALJ reasonably found Mr. Edgell's reported symptoms to be inconsistent with the record evidence. (*Id.* at 11-16.) In this regard, the Commissioner contends that the ALJ did not assess Mr. Edgell's overall truthfulness or character, but rather reasonably articulated her reasons for discounting his reported symptoms. (*Id.* at 12-16.)

As explained below, the Court finds that the ALJ erred in two respects. First, the ALJ erred by failing to either:  (a) account, in the assigned RFC, for a moderate functional limitation arising from Mr. Edgell's severe mental impairments, despite giving great or significant weight to two

medical source opinions supporting the limitation; or, (b) explain why she rejected the medical source opinions at issue. Second, the ALJ erred by failing to provide an adequate reason for discounting significantly probative evidence regarding the effects of Mr. Edgell's psychogenic tremors.[9] The Court will therefore reverse the decision and remand this matter for the ALJ to address the errors. *Clifton*, 79 F.3d at 1010.

**A.     The ALJ failed to account for a moderate mental limitation in assessing Mr. Edgell's RFC despite giving great or significant weight to medical source opinions supporting it.**

The Court first considers Mr. Edgell's argument that the ALJ erred at step four by failing to account for moderate functional limitations she acknowledged at step three, arising from severe mental impairments she found at step two. (Doc. 22 at 5-10.) As noted above, at step two, the ALJ found that Mr. Edgell suffers from the severe mental impairments of ADHD and conversion disorder. (AR 772.) Also, the ALJ elsewhere found that "[t]he objective medical evidence of record shows that the claimant has been diagnosed with … generalized anxiety disorder with depression," and that this impairment has "more than a minimal impact on the claimant's ability to engage in basic work activities." (AR 779.) Moreover, the ALJ acknowledged that

> [t]hroughout the record, there are several mental diagnoses for the claimant. After reviewing these diagnoses and their corresponding symptoms, the undersigned feels that the above stated impairments are most consistent with the record. Accordingly, the claimant's psychological symptoms and their effect on his functioning have been considered together, instead of separately, regardless of the diagnostic label attached.[10]

---

[9] Mr. Edgell also contends that the ALJ made other errors warranting reversal. (Doc. 22.) The Court will not address these alleged errors because they may be affected on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

[10] As the ALJ acknowledged, Mr. Edgell's records evidence psychological diagnoses in addition to those the ALJ found to be severe medically determinable impairments. For example, Nurse Practitioner Cecilia Cordova assessed Mr. Edgell as having PTSD on April 7, 2014, (AR 385); a provider at the Evolution Group assessed him as having PTSD on July 3, 2014, (AR 410); Nurse Practitioner Jacqueline Willis assessed him as having bipolar disorder, major depressive disorder, and PTSD from March 7, 2018 to February 16, 2019, (AR 1545-62); and, Eligio Padilla, Ph.D., diagnosed him as having recurrent, severe major depressive disorder and chronic PTSD. (AR 1563, 1569-70.)

(AR 779.)

The record includes significantly probative evidence, including medical opinion evidence, of the limiting effects of these severe, medically determinable impairments. *Inter alia*, non-examining state agency consultant Christal Janssen, Ph.D., completed a Mental Residual Functional Capacity Assessment ("MRFCA") form on January 29, 2014, as part of Mr. Edgell's initial Disability Determination Explanation ("DDE") regarding his August 2013 applications. (AR 62, 71-73.) The MRFCA form is divided into four sections that address four different categories of functional limitations: understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitations, and adaptation limitations. (AR 71-73.) Each of these sections contains two subparts: a question-and-answer worksheet portion where the consultant "rate[s]" the claimant's limitations in specified areas, and a narrative portion where the consultant records "the actual mental residual functional capacity assessment" and "describes how the evidence supports each conclusion." (AR 71-73.) Then, at the end of the form, there is a section entitled "MRFC - Additional Explanation," where the consultant may record "[a]ny other assessment information deemed appropriate[.]"[11] (AR 71, 73.)

---

Notwithstanding the ALJ's generic assertion that she considered all of Mr. Edgell's psychological symptoms "regardless of the diagnostic label attached," (AR 779), the Court is troubled by her failure to even discuss whether Mr. Edgell's PTSD is a severe medically determinable impairment, much less acknowledge record evidence that Mr. Edgell suffers from symptoms specific to this disorder, including nightmares, avoidance of triggers, and hypervigilance. (*See, e.g.*, AR 412 (noting Mr. Edgell's July 31, 2014 report of "nightmares of being shot"); AR 1565 (noting Mr. Edgell's November 15, 2018 report of avoidance of triggers and hypervigilance).)

[11] The complete instructions on the MRFCA form state:

The questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion. This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation). Any other

On the worksheet portion of this form, Dr. Janssen opined that Mr. Edgell is moderately limited in the abilities to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact with the general public; accept instructions and respond to criticism from supervisors; respond to changes in the workplace; and, set realistic goals or make plans independently. (AR 71-73.)

In the narrative portion of each section of the form, Dr. Janssen simply stated, "see rationale." (AR 71-73.) In so doing, she was apparently referring to the "MRFC – Additional Explanation" portion of the form. (AR 73.) There, Dr. Janssen summarized Mr. Edgell's mental health history to date and concluded that

> objective findings and [consultative examination] conclusions do not suggest [Mr. Edgell] is precluded from all work.[12] He reportedly is capable of following some simple instructions and can perform [activities of daily living]. [Mr. Edgell] should be able to perform work where interpersonal contact is incidental to work performed; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled).

(AR 73.)

Similarly, non-examining state agency consultant Mark McGaughey, Ph.D., completed a MRFCA form on December 11, 2018, as part of Mr. Edgell's initial DDE regarding his December

---

> assessment information deemed appropriate may be recorded in the MRFC - Additional Explanation text box.

(AR 71.)

[12] The Court notes that Mr. Edgell need not be "precluded from all work" to be disabled. (AR 73.) Rather, the operative question at step five of the sequential evaluation process is whether he is able to perform work that exists in significant numbers in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

2017 applications. (AR 906-07, 922-24.) On the worksheet portion of this form, Dr. McGaughey

opined that Mr. Edgell is markedly limited in the ability to understand, remember, and carry out

detailed instructions, and moderately limited in the abilities to:  carry out very short and simple

instructions; maintain attention and concentration for extended periods; perform activities within

a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an

ordinary routine without special supervision; make simple work-related decisions; complete a

normal workday and workweek without interruptions from psychologically based symptoms and

perform at a consistent pace without an unreasonable number and length of rest periods; interact

with the general public; accept instructions and respond to criticism from supervisors; get along

with coworkers without distracting them or exhibiting behavioral extremes; maintain socially

appropriate behavior and adhere to basic standards of neatness and cleanliness; respond to changes

in the workplace; be aware of normal hazards and take appropriate precautions; travel in unfamiliar

places or use public transportation; and, set realistic goals or make plans independently. (AR 922-

23.)

In the narrative portion of each section of the form, Dr. McGaughey simply stated, "see

below." (AR 22-23.) Like Dr. Janssen, Dr. McGaughey was apparently referring to the "MRFC –

Additional Explanation" portion of the form. (AR 22-24.) There, Dr. McGaughey discussed Mr.

Edgell's mental health history from September 2016 to date[13] and concluded,

> [o]verall evidence supports that [Mr. Edgell] retains the capacity to understand,
> remember and carry out simple instructions, make simple decisions, attend and
> concentrate for a significant length of time, interact adequately with others on
> incidental basis, and respond appropriately to changes in a routine work setting.

---

[13] It appears that Dr. McGaughey did not consider medical evidence of record before September 30, 2016, because
the ALJ first denied Mr. Edgell's August 2013 claims on September 29, 2016, (AR 9), and had not yet consolidated
these claims with Mr. Edgell's December 2017 claims on remand. (*See* AR 918 (noting that Mr. Edgell "[c]annot
evade ALJ decision, and therefore, development, should only be made from 9/30/16 to Present").)

(AR 924.)

> The ALJ accepted Dr. Janssen's opinions without reservation, giving them
>
> great weight. First, they are thoroughly explained and supported by citations to the medical evidence. Second, they are consistent with the longitudinal evidence of record—in particular, the claimant's mental status examinations, which demonstrate instances of abnormal mood and affect but generally benign other findings…. Finally, [Dr. Janssen was] able to formulate these opinions after a thorough review of the evidence and in reliance upon [her] familiarity with Social Security disability standards.[14]

(AR 787.) Thus, the ALJ accepted Dr. Janssen's opinion that Mr. Edgell is moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*See* AR 787.)

In addition, the ALJ gave Dr. McGaughey's opinions "significant weight," stating that they are "thoroughly explained and supported by citations to the medical evidence," and that Dr. McGaughey was "able to formulate his opinion[s] after a thorough review of the evidence and in reliance upon [his] familiarity with Social Security disability standards." (AR 787-88.)

> Although he finds slightly more significant limitations than the other state agency consultants—due to apparent reliance upon the November 2018 consultative examination (which is inconsistent with the longitudinal evidence…)—Dr. McGaughey's opinion is generally consistent with the mental status examinations across the entire relevant period, which show some abnormalities, but many benign findings.

---

[14] The ALJ discussed Dr. Janssen's opinions in conjunction with the opinions of state agency psychological consultant Alvin Smith, Ph.D., who assessed Mr. Edgell's mental RFC on reconsideration of his August 2013 applications. (AR 787; *see* AR 94, 103-06.) The Court notes that, problematically, the ALJ gave both consultants' opinions "great weight," applying exactly the same reasoning to both sets, even though they are not identical. (AR 787; *compare* AR 71-73 (Dr. Janssen) *with* AR 103-06 (Dr. Smith).) In particular, unlike Dr. Janssen, Dr. Smith found Mr. Edgell to be "[n]ot significantly limited" in the abilities to sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 103-06.) Also, unlike Dr. Janssen, in the narrative portion of the section regarding sustained concentration and persistence limitations, Dr. Smith opined that Mr. Edgell "retains the ability to sustain attention to simple, repetitive activities." (AR 104.) The ALJ did not address these differences in unreservedly accepting both sets of opinions in her decision.

(AR 788.) Thus, the ALJ accorded significant weight to Dr. McGaughey's opinion that Mr. Edgell is moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*See id.*)

"[A] moderate impairment is not the same as no impairment at all." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007). Nevertheless, as discussed below, the RFC the ALJ assigned to Mr. Edgell fails to account for his limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, as opined by Drs. Janssen and McGaughey. (AR 72, 777-78, 923); *see also* POMS DI § 25020.010(B)(3)(*i*)[15] (ability to complete normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods is a mental ability critical for performing unskilled work and "[t]hese requirements are usually strict").

The Commissioner argues that the assigned RFC "adequately account[s]" for this limitation because it restricts Mr. Edgell to work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning. (Doc. 28 at 9.) And, the Tenth Circuit *has* found in some instances that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016); *see also Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015). However, this is not always the case. *Vigil*, 805 F.3d at 1204; *Groberg v. Astrue*, 505 F. App'x 763, 770 (10th Cir. 2012). Thus, "[u]nless the connection (between the limitation and the

---

[15] The Program Operations Manual System, or POMS, "is a set of policies issued by the Social Security Administration to be used in processing claims. This court defers to the POMS provisions unless we determine they are arbitrary, capricious, or contrary to law." *Anders v. Berryhill*, 688 F. App'x 514, 521 (10th Cir. 2017) (quotation marks, brackets, and citations omitted).

work) is obvious, … the agency must ordinarily explain how a work-related limitation accounts for mental limitations reflected in a medical opinion." *Parker v. Comm'r, SSA*, 772 F. App'x 613, 616 (10th Cir. 2019).

In this case, the connection between the limitation and the work is not obvious. The assigned RFC's limitation to simple tasks with occasional changes in the routine work setting and occasional independent goal setting or planning *does* appear to address Mr. Edgell's impaired abilities, per Drs. Janssen and McGaughey, to understand, remember, and carry out detailed instructions, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, and set realistic goals or plan independently.[16] (AR 71-73, 922-24.) But the connection between these limitations and an impaired ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods is not clear. And, absent an adequate explanation from the ALJ on this point, it would be inappropriate for the Court to speculate about what that connection might be. *Cf. Peterson v. Saul*, 19-cv-486, 2020 WL 1911567, at *12 (D.N.M. Apr. 20, 2020) (restriction to simple, routine tasks did not sufficiently account for moderate limitation in ability to complete normal workday and workweek without interruptions and perform at consistent pace without an unreasonable number and length of rest periods).

Nor does *Fannin v. Commissioner, SSA*, 857 F. App'x 445 (10th Cir. 2021), redeem the ALJ's omission. In *Fannin*, the Tenth Circuit held that, when asking hypothetical questions to a vocational expert, an ALJ may rely on an agency consultant's narrative mental RFC so long as the

---

[16] The connection between the assigned mental RFC and Mr. Edgell's moderately impaired ability to maintain attention and concentration for extended periods is less clear; however, Dr. McGaughey did specifically opine that Mr. Edgell "retains the capacity to … attend and concentrate for a significant length of time," (AR 924), which creates some ambiguity regarding the nature and extent of Mr. Edgell's limitation in this area of mental functioning.

narrative RFC is consistent with the limitations found on the worksheet portions of the form.[17]

*Fannin*, 857 F. App'x at 447–48; *see also Smith*, 821 F.3d at 1269 (finding that the ALJ

incorporated worksheet limitations "by stating how the claimant was limited in the ability to

perform work-related activities"). However, the Tenth Circuit has made clear that an ALJ should

not "turn a blind eye to any moderate limitations enumerated in [the worksheet sections] that are

not adequately explained" in the narrative sections. *Lee v. Colvin*, 631 F. App'x 538, 541 (10th

Cir. 2015); *see also Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (explaining that the

POMS requires consultants to incorporate in the narrative portion all limitations found in the

worksheet portion). Thus, an ALJ may only disregard limitations found in the worksheet portions

when the narrative portions "adequately encapsulate[]" them. *Carver*, 600 F. App'x at 619.

    As already noted, Drs. Janssen and McGaughey did not record Mr. Edgell's mental RFC

in the four narrative portions of the MRCFA form as instructed. (AR 71-73, 922-24.) Thus, they

did not incorporate the moderate limitations recorded in the worksheet portions into narrative

---

[17] In *Fannin* and related cases, the Tenth Circuit relies on the instructions in the POMS for the SSA-4734-F4-SUP mental RFC assessment form, which is divided into three sections. *See Fannin*, 857 F. App'x at 446, 447; *Lee v. Colvin*, 631 F. App'x 538, 540–41 (10th Cir. 2015); *see also* POMS DI 25020.010(B)(1). Here, however, the state agency consultants used the electronic Claims Analysis Tool ("eCAT"), and their assessments are included as the MRFCA portion of the DDE.

Although the MRFCA portion of the DDE is not divided into three sections like the SSA-4734-F4-SUP, courts have found that Section I of the SSA-4734-F4-SUP is analogous to the worksheet portions discussed above, and Section III is analogous to the narrative portions. *See, e.g., Vienna v. Saul*, No. 18-cv-783, 2019 WL 4686718, at *4 n.8 (D.N.M. Sept. 26, 2019) ("Although SSA-4734-F4-SUPs (MRFCAs) completed through eCAT no longer have these section labels, parties and the courts have continued to refer to the checkbox portion of each MRFCA as 'Section I,' and the 'narrative' portion(s) as 'Section III.'"); *but cf. Cordova v. Berryhill*, No. 17-cv-0611, 2018 WL 2138647, at *6 (D.N.M. May 9, 2018) ("[T]he Court cannot agree with Defendant that in this case, the ALJ was permitted to ignore the 'Section I' findings when there is no 'Section I' in [the MRFCA form at issue.]").

However, whereas the SSA-4734-F4-SUP "instructs completing psychologists to offer their narrative conclusions separately in Section III, which is labeled 'Functional Capacity Assessment,'" the MRFCA portion of the DDE "instructs completing psychologists to input narrative conclusions after each category of mental function." *Kim L.P. v. Saul*, No. 18-cv-552, 2020 WL 5802927, at *3 (N.D. Okla. Sept. 29, 2020). Thus, in the MRFCA portion of the DDE, the "Section III" narrative is divided across the four sections, requiring the consultant to specify a mental RFC for each category of mental function.

mental RFCs for each category of mental function. Moreover, assuming the additional explanation portion of the MRCFA recorded Drs. Janssen's and McGaughey's narrative findings, the ALJ still would not be permitted to ignore the worksheet section limitation at issue here, because the consultants' additional explanations do not adequately encapsulate it. For example, although Dr. Janssen opined that Mr. Edgell can "perform work where … complexity of tasks is learned and performed by rote, [with] few variables [and] little judgment[, and] supervision required is simple direct and concrete," (AR 73), this additional explanation fails to address her finding that Mr. Edgell is moderately limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace. (AR 72.)

When an ALJ does not account for functional limitations a medical source assesses by limiting the claimant to particular kinds of work activity, but instead assigns an RFC that contradicts a medical source opinion, the ALJ must explain why she did not account for the medical opinion in her RFC determination. *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence."). Where the ALJ does not adequately explain her rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Haga*, 482 F.3d at 1208-09; *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Givens*, 251 F. App'x at 568. Here, the ALJ offered no explanation for her failure to incorporate Drs. Janssen's and McGaughey's assessed limitation in Mr. Edgell's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods.[18] (AR 787.) As such, the case must be remanded for the ALJ to provide the required explanation or account for the limitation in the RFC.

**B.     The ALJ failed to provide an adequate reason for discounting the effects of Mr. Edgell's psychogenic tremors.**

Mr. Edgell also argues the ALJ improperly discounted the effects of his tremors. (*Id.* at 6, 10.) The record evidence is replete with references to these tremors, which are most predominant in Mr. Edgell's right arm. In July 2014 adult function reports completed with the help of family members, Mr. Edgell noted that the tremors inhibit him in performing activities of daily living, such as cooking and handling money. (AR 262-77.) At his April 2016 hearing, Mr. Edgell testified that he has "a hard time with holding anything" and "throw[s] stuff out of [his] hands" due to the tremors. (AR 41.) Adult function reports in March 2018 again note that the tremors limit Mr. Edgell's activities of daily living. (AR 1180-95.)

Mr. Edgell consulted Nurse Practitioner Lorraine Cordova at New Mexico Neurology Associates regarding his tremors from April to June 2014. (AR 358-59, 744-45.)  NP Cordova noted that Mr. Edgell "has persistent right hand and arm shaking with overflow tremors throughout his body." (AR 358.) After an EEG showed the tremors were "not associated with cortical changes," she diagnosed Mr. Edgell with conversion disorder with nonphysiologic tremors worse in the right arm and prescribed gabapentin. (AR 359, 745.)

Nurse Practitioner Cecilia Cordova at Romero Family Medicine noted a "severe," "persistent," or "consistent" tremor in Mr. Edgell's right arm on several examinations between April and September 2014. (AR 381-82 (April 2014), 378 (May 2014), 375 (June 2014), 373

---

[18] The ALJ did explain why she gave Dr. McGaughey's opinions somewhat less weight than those of Dr. Janssen and other state agency consultants, *i.e.*, because in finding "slightly more significant limitations than the other state agency consultants," Dr. McGaughey appeared to rely on a consultative examination that the ALJ found "inconsistent with the longitudinal evidence." (AR 788.) However, this explanation does not apply to the limitation at issue here, because the opinions of Drs. Janssen and McGaughey regarding the limitation are identical.

(August 2014), 370 (September 2014).) She diagnosed him with "[a]bnormal involuntary movements" and noted that he was taking gabapentin for the tremors. (AR 373-76, 379.) Also in 2014, Mr. Edgell saw a mental health provider at the Evolution Group,[19] who observed his tremors at appointments in July and August. (AR 410 (July 3, 2014, "severe tremors"), 412 (July 31, 2014, "tremor in right arm very pronounced today"), 413 (August 28, 2014, "[s]evere tremors in right arm through[]out hour of therapy").)

Other providers who treated Mr. Edgell from 2014 to 2019 also noted his tremors. These providers include an orthopedist in May 2014, (AR 425-27); a gastroenterologist in October 2014, (AR 391); an ophthalmologist in July 2015, (AR 439-40); home healthcare providers from October 2015 to January 2016, (AR 496, 503, 505, 507, 511, 517, 533, 538, 544, 560, 565, 570, 574, 578, 592, 605, 619, 629, 634, 643, 653, 658, 666); cardiologists in October 2015, February 2017, and April 2017, (AR 729, 1353, 1361); emergency room physicians in October 2015, June 2016, July 2017, September 2017, and January 2019, (AR 1254-55, 1267, 1277-78, 1311, 1603, 1605); general practitioners in November 2015, June 2016, July 2016, January 2017, April 2017, March 2018, and August 2019, (AR 465-68, 1228-29, 1455-58, 1459-62, 1471-73, 1493, 1770-75); a mental health nurse practitioner in October 2016, (AR 1417); and, a general surgeon in May 2018, (AR 1584).

Notwithstanding the years of medical documentation evidencing Mr. Edgell's persistent right arm tremors, the ALJ does not appear to have included any limitations arising from them in assessing Mr. Edgell's RFC. (AR 786.) In particular, the RFC she assigned includes no limitations on fingering or handling despite Mr. Edgell's and others' uncontroverted reports that the tremors, since their April 2014 onset, have significantly limited Mr. Edgell's abilities in these areas. (AR

[19] This provider's signature is not legible. (AR 410-20.)

777-78; *see* AR 358 (noting April 25, 2014 onset of tremors).) The ALJ justified this rejection on the basis that Mr. Edgell's tremors "hav[e] no physiological cause." (AR 786.) However, this reason is improper in the context of the ALJ's own findings, based on uncontroverted record evidence, that Mr. Edgell's tremors result from a severe, medically determinable mental condition, *i.e.*, conversion disorder. (AR 772, 780, 786.)

Conversion disorder is "a mental condition in which a person has … nervous system (neurologic) symptoms that cannot be explained by medical evaluation." Medline Plus, "Conversion Disorder," https://medlineplus.gov/ency/article/000954.htm (last accessed June 3, 2022).

> People who have conversion disorder are not making up their symptoms in order to obtain shelter, for example (malingering). They are also not intentionally injuring themselves or lying about their symptoms just to become a patient (factitious disorder). Some health care providers falsely believe that conversion disorder is not a real condition and may tell people that the problem is all in their head. But this condition is real. It causes distress and *cannot be turned on and off at will*.

*Id.* (emphasis added); *see also* Mayo Clinic, "Functional neurologic disorder/conversion disorder," https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197 (last accessed June 3, 2022) (symptoms of conversion disorder "are real" and patients "can't intentionally produce or control" them). "Signs and symptoms" of conversion disorder, also referred to as functional neurologic disorder, include "[a]bnormal movement, *such as tremors*[.]"[20]

---

[20] Notably, other signs and symptoms of conversion disorder include difficulty walking, loss of balance, episodes of apparent loss of consciousness, vision problems, and cognitive difficulties involving memory and concentration, all of which Mr. Edgell's records indicate he has experienced during the relevant time frame. https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197; (*see, e.g.*, AR 378 (difficulty walking), 439, 443 (vision problems), 529 (loss of balance), 729, 1266, 1376 (loss of consciousness), 1563-70 (cognitive difficulties involving memory and concentration); *see also* AR 902-03 (Appeals Council's summary of evidence regarding Mr. Edgell's need for an assistive device to walk).)

https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197 (emphasis added).

Mr. Edgell was diagnosed with conversion disorder with nonphysiologic tremors in April 2014. (AR 359.) The ALJ identified no record evidence to contradict this psychological diagnosis, and indeed relied on it in her step-two finding that Mr. Edgell's conversion disorder is a severe, medically determinable impairment. (AR 772.) Thus, her proffered reason for discounting the effects of his tremors, *i.e.*, that the tremors are nonphysiologic, is plainly inadequate. The ALJ cannot properly disregard the diagnosed physical effect of a severe, medically determinable impairment merely because the impairment itself is mental rather than physiological. *See Williams v. Berryhill*, 682 F. App'x 665, 670 (10th Cir. 2017) (ALJ erred in failing to consider claimant's conversion disorder in assessing her RFC); *see generally Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (ALJ must consider combined effect of all medically determinable impairments, including mental impairments, at steps four and five); *Grotendorst v. Astrue*, 370 F. App'x 879, 883-84 (10th Cir. 2010) (same).

The only other reason the ALJ provided for discounting the record evidence regarding the effects of Mr. Edgell's tremors is that they "were noted as improving with medication." (AR 786.) In support of this proffered reason, the ALJ relied on two medical records. First, she cited to the June 16, 2014 note of NP Lorraine Cordova indicating that "[g]abapentin with lorazepam helped tremor for 3-4 hours, then tremor returns. Gabapentin alone modestly reduces tremor." (AR 744 (cited at 786).) Second, she cited to NP Cecilia Cordova's June 24, 2014 note indicating that an

increased dose of gabapentin "is helping with tremors. Makes him a little tired but tremors have decreased."[21] (AR 375 (cited at AR 786).)

Substantial evidence does not support the ALJ's decision to wholly discount the effects of Mr. Edgell's tremors on the basis that medication improved them. Even the two June 2014 records the ALJ cited show that although medication improved the tremors, it did not eradicate them. (AR 375, 744; *see also* AR 435 (as of October 14, 2015, Mr. Edgell was "taking 300 mg of gabapentin 3 times daily for tremor, however this medication does not completely alleviate the symptoms"). And abundant records after June 2014 show that the tremors have remained chronic, persistent, and significant despite the medication Mr. Edgell has been prescribed. (*See, e.g.*, AR 410, 412 (July 2014, "severe," "very pronounced" tremor); AR 413 (August 2014, "[s]evere tremors … through[]out hour of therapy"); AR 729, 1267 (October 2015, "chronic," "significant" tremor); AR 467, 511 (November 2015, "[p]ersistent," "constant" tremor); AR 1458 (July 2016, "moderately severe" tremor); AR 1471 (April 2017, "unstable" tremor); AR 1255 (September 2017, "significant" tremor); AR 1603, 1605 (January 2019, "chronic" tremor); AR 1772, 1775 (August 2019, "chronic," "constant" tremor). In sum, the first reason the ALJ gave for discounting the effects of Mr. Edgell's tremors is legally erroneous and the second is not supported by substantial evidence. Remand is warranted so that the ALJ may either consider the alleged limitations arising from this impairment in assessing Mr. Edgell's RFC, or provide a valid reason for discounting them. *Clifton*, 79 F.3d at 1010.

## C.     The ALJ's errors were not harmless.

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless, "harmless

---

[21] A third citation in the ALJ's decision regarding Mr. Edgell's response to medication pertains to his headaches rather than his tremors. (AR 311 (cited at AR 786).)

error analysis . . . may be appropriate to supply a missing dispositive finding" where a court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34 (quotation marks omitted). Here, the Court cannot confidently say that no reasonable factfinder, following the correct analysis, could have resolved the factual questions at issue in any other way.

As discussed in subsections III.A. and B., *supra*, the ALJ failed to: (1) account for or explain her rejection of a moderate mental limitation to which Drs. Janssen and McGaughey opined in assessing Mr. Edgell's RFC; and, (2) provide a valid reason for discounting uncontroverted evidence regarding the effects of Mr. Edgell's tremors. Because she did not provide an adequate explanation for her treatment of this significantly probative evidence, the Court cannot determine whether the ALJ properly rejected it. Assuming she did not, this evidence could reasonably have led to different findings, *i.e.*, the ALJ may have partially or fully credited Mr. Edgell's statements regarding the limiting effects of his disorders. This, in turn, would likely have resulted in a more restrictive RFC. (*See* AR 823-24 (VE testified that limitations on handling, fine fingering, and persistence would erode job base available to Mr. Edgell).) In these circumstances, the Court cannot say the ALJ's errors were harmless.

## IV. <u>Conclusion</u>

For the reasons stated above, Mr. Edgell's Motion to Reverse and Remand, with Supporting Memorandum (Doc. 22) is GRANTED. This matter is REMANDED to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent